# CASES IN CHANCERY.

## DELAWARE.

### PHILLIP MARVEL,

*vs.*

### GEORGE W. ORTLIP, WILLIAM SWINDLE, ROBERT COULTER AND PETER CALDWELL.

*New Castle, Sept. T. 1866.*

O. and S. having entered into a contract for the sale of certain real estate of O., possession to be given at the end of the renting year, M. a tenant of O. having received due notice to quit, leased the property from S., in writing, from the date at which the possession was to change under the contract. The contract of sale not being performed O. took proceedings for forcible detainer against M. who sought to restrain them by injunction. *Held*, that, in the absence of consent either express or implied, from acts and declarations sufficient show such consent, S. had no right to make a demise to take effect at or after the time specified for the performance of the contract of sale.

Upon the special facts of the case, the acts and declarations proved were not sufficient to amount to a consent to the lease on the part of the vendor, or to equitably estop him from proceeding to recover the possession from the tenant.

Equity does not confer upon a purchaser, under a contract for the sale of real estate, any power whatever over the possession of the premises sold, whether by entry, sale or lease, so long as the contract is unexecuted, though after the time fixed for its execution.

2

Such purchaser cannot, by virtue of his mere equitable estate, without the vendor's consent, lease the property to take effect after the time fixed for performance absolutely, whether the contract shall in fact be performed at the time appointed or not.

The vendor's right of possession, or, technically speaking, his seisin, unless it is otherwise stipulated, attends the legal estate and remains with it in the vendor until passed from him by a conveyance of the legal title.

The rule of equitable estoppel is that where one by his acts, declarations or silence, where it is his duty to speak, has induced another person, in reasonable reliance on such acts or declarations, to enter into a transaction, he shall not, to the prejudice of the person so misled, impeach the transaction.

The object of the rule is to adjust equitably a loss between two parties, one of whom must bear it, and it is considered that he should bear it who has caused it.

The facts upon which an equitable estoppel is claimed must present two requisites: *first*, that the party claiming it was misled and induced to enter into the transaction upon the faith of the fact or relation which he seeks to restrain the other party from denying and, *secondly*, that his being so misled was not through his own negligence, or want of attention to proper means of information.

The maxim, *vigilantibus non dormientibus leges adjuvant*, specially applies to a claim of equitable estoppel, since in such cases, the interposition of equity is extraordinary and restrictive of what but for the estoppel would be a clear legal right.

A motion to dissolve an injunction is always in order and should be heard with all possible dispatch.

The rule allowing a specified time for exceptions to an answer has no application to a motion to dissolve a preliminary injunction, and it is no objection to such motion that it is made before the expiration of the time allowed by the rule.

On a motion to dissolve a preliminary injunction the answer is properly treated as a mere affidavit.

The common injunction under the English practice is used as a means of compelling the defendant to appear and make full answer, and if the answer is full, such an injunction is dissolved. In this country the common injunction is not known.

Distinction stated between common and special injunction under the English practice.

To entitle a defendant to move to dissolve a preliminary injunction, his answer need only deny the facts necessary to the equity of the bill and the sufficiency of the answer as to other matters, including such discovery as may be sought, will remain open to be tested by exceptions.

The general rule that one defendant cannot move to dissolve an injunction until the other defendants have answered, does not apply where the remedy by injunction was sought against the defendant alone who had answered, when the equity, if any, must spring from his acts or declarations and there was no community of interest between the defendants, but only between one of them and complainant.

The question whether there is jurisdiction in this Court to restrain proceedings before a Justice of the Peace for holding over or forcible entry and detainer not determined,—the case being decided against the complainant,—further than that, under like circumstances, the objections taken would not prevent the issuing of a preliminary injunction.

BILL IN EQUITY TO RESTRAIN PROCEEDINGS UNDER THE LANDLORD AND TENANT ACT AGAINST A TENANT HOLDING OVER.—The bill alleged that complainant was an Innkeeper, at Newark, of the Washington Hotel ; he had been tenant for two years past and and paid all rent. About Dec. 25th he received written notice to .quit, &c. At and before service Ortlip informed him that he was about to sell, but, if he should not succeed, Marvel should be continued at same rent, $500 and taxes. About Nov. 7th, 1865, Ortlip informed complainant that he had sold to Swindle. He had in fact contracted to sell by written agreement, under seal, dated Nov. 7th, 1865. The agreement was to convey by March 25th, 1866, for $8,000, $400 on execution of deed, also a conveyance of 105 acres of land in Lower Oxford.

A receipt for note for $400 at 90 days for the first payment was endorsed on the agreement. The agreement was left in custody of Isaiah Fox, of Chester County, who still retained it, and an order for production was prayed. A note was given for the $400, on part payment, which Ortlip has admitted to be since paid. ·Full control of properties was given up notoriously. Ortlip frequently declared it a sale and bargain in good faith, and

that Swindle had a perfect right to rent, sell or do what he pleased with the said Hotel property, and that he, Ortlip, had the same rights as to Chester County property. He frequently discussed, in public, the terms of sale, and stated what he had received in part payment. Soon after, Swindle advertised the Hotel for sale as his own property —put it up—received sundry bids and withdrew it. Several weeks after he demised to complainant in writing— The lease was set out, dated Feb. 15th, 1866, at $500, and all taxes for one year from March 25th, 1866. It was left with William Reynolds, and in his custody and an order to produce it was prayed. About the same time Ortlip advertised, as his own, the Chester County property ; handbills of both were posted in the Hotel at the same time. It was put up for sale in Chester County and Ortlip received bids, withdrew it and offered to rent it; did as complainant is informed and believes, rent verbally, from March 25th, to a person in Chester County, name not known. The bill avers strongly that complainant took the lease from Swindle and paid $75.00 in advance of rent. In accordance with the said statements of the said Ortlip and the said Swindle made to himself and others, and induced by their public acts and dealings and declarations respecting the transfer of the right of possession and ownership of the said hotel and premises, in consequence and by reason of the information given to him by the said Ortlip and the said Swindle and induced by their public action and confirmation of each other's proceedings in respect of the said property so sold and exchanged between them, and with no notice or knowledge of any nature or character whatsoever, whether direct or implied, from the said parties, or either of them, that full power and authority had not been 'mutually given and conferred to do and perform lawfully the acts hereinbefore set forth as having been done by them respectively with the said properties, complainant accepted the lease from Swindle.

Swindle afterward assigned all his property to Coulter and Caldwell and had gone away. About the last of February Coulter exhibited the assignment and inquired about lease and notified complainant he would hold him for the rent.

After this Ortlip notified complainant that the arrangements with Swindle would not be carried out and that he would not be allowed to remain in possession. Had since begun proceedings, under Landlord and Tenant Act, before Esquire Staats, and complainant was summoned to appear Tuesday, April 3d.

The grounds of relief set up by the bill were, first, that Ortlip and Swindle were estopped to deny lease ; second, complainant should not be compelled to pay rent until it should be adjudged who was entitled, being induced by their joint acts, and the legal title being in dispute under an existing contract executory and part performed ; third, complainant was entitled to have lease specifically performed ; fourth, testimony out of the State and only obtainable under commission. The bill prayed an injunction against proceedings for forcible entry and detainer or claim for rent, &c., until the right was determined, and also that the lease might be performed.

A preliminary injunction was granted on the 2nd of April and on the 10th of the same month the defendant, Ortlip, filed his answer which was substantially as follows : It admitted the tenancy of Marvel under a lease from him dated March 25th, 1863, extended by holding over, until notice to quit, more than three months prior to March 25th, 1866, terminated the estate and term of complainant as his tenant. It denied however that he informed complainant that he was about to sell or promised that he should continue for another year if the sale was not made. On the contrary, long anterior to that date he had entered into the contract with Swindle, for the sale of the property, as set forth in the bill, but

the defendant claimed that even if any such suggestion
of continuing had been made, in view of the notice to
quit admitted, there would be no claim to continue the
tenancy upon such declarations as were alleged in the
bill. The answer further admitted the contract of sale to
Swindle and that he informed .complainant of it about
November 7th, 1865. He also admitted the making of the
note for the cash payment, as alleged, but denied pay-
ment of the same in whole or in part, but the same was
protested and returned to the complainant who held the
same unpaid. It denied the exchange of possession or
control of the properties except that each in expectation
of the performance of the contract endeavored to obtain
a purchaser. It was admitted that these matters were
undoubtedly notoriously talked about by the resepctive
parties up to the ·15th, 16th, or 17th of February, with
full confidence that the agreement would be carried out,
but complainant knew or had the means of knowing,
the exact relation of the parties, and that the contract
was merely executory. Through the notoriety of all the
proceedings, the complainant knew that the sale rested
merely in contract. It was denied that, at any time,
complainant had any ground to consider that Swindle
had any right to rent or sell the hotel or was misled by
defendant in any way. The answer also admitted the ad-
vertisement of the hotel by Swindle, as his own property,
but denied his right at any time to do so, or any authority
to sell or advertise on behalf of Ortlip. The latter resided
in Pennsylvania, was in Newark only once from November
6th to February 27th, knew little of what transpired
then,and nothing of what passed at the sale. He admitted,
on information and belief, the fact of the lease by Swindle
to complainant but is unaware of its terms. It also ad-
mitted the advertisement for sale and the verbal lease of
the farm, but on learning that he could not get the title,
gave notice to the lessee that he could not comply. He
did not know the reasons why complainant entered into

a contract of lease with Swindle, but believed it was upon the expectation that the contract of sale would be carried out and denied any notice to complainant that Swindle's act or contract would be recognized, and had no knowledge of any payment by complainant to Swindle on account of rent. Upon hearing, on February 15th, that Swindle had made an assignment and absconded, Ortlip immediately sent word of it to complainant and inquired if he wanted to rent the hotel for another year, and complainant twice sent word, that the defendant Ortlip, might rent it to whom he pleased for he was going to leave it. Whereupon defendant on the premises, in the presence of complainant, leased it to another party who first went to Newark and inspected the property, complainant being present and interposing no objection. The answer also admitted the assignment to Coulter and Caldwell but denied that they had claimed to hold complainant for the rent reserved by Swindle, and alleged that after complainant's interview with Coulter, defendant notified him that his agreement with Swindle could not be carried out and that complainant did not remonstrate with him, although, if he had done so, it would not have been of any force, because of complainant's cognizance of all the occurrences, and of the message twice sent to Ortlip that he might rent to whom he pleased. The commencement of holding over proceedings was admitted and the equity of the bill specifically denied.

*Patterson*, for defendants, having filed the defendant's answer moved to dissolve the injunction.

*T. F. Bayard*, for complainant, objected that such a motion cannot be entertained until the expiration of the time, under the rule for filing exceptions to the answer.

THE CHANCELLOR :—

Under the rules the complainant is allowed a certain time after the filing of the answer, within which

to except to it.  If the answer is filed more than three days before the term, the complainant has until the term, but if the answer comes in within three days of the term or during the "sitting of the Court," then, Rule 11,* gives thirty days for filing exceptions.  The object of thus giving the complainant a prescribed time for exceptions, is to secure his right to have a discovery by defendant of the matters inquired of by the bill. The benefit of such discovery arises at the hearing of the cause on bill and answer, or bill, answer and testimony.  It is then, and for the purpose of obtaining a final decree that admissions in the answer may avail the complainant, and it is in this way that he is prejudiced by the insufficiency of the answer.  Hence, to protect him against the effect of an insufficient answer and secure to him, at the hearing of the cause, the full benefit of his rights to a discovery, the Rule allows him a time to except to the answer and thus compel the defendant to a full disclosure of the matters relied on by the bill to sustain

---

*At the time of this opinion, Rule 11 was as follows:—

It is ordered, that in case of an answer coming in during the sitting of the court in term, or within three days preceding, the complainant or complainants shall have one month's time next after the filing of the same, to except thereto; and in case no exceptions be exhibited within that time, that the Register enter replication and rejoinder *gratis*, and rules for commissions on both sides, to be directed to commissioners to be named by the parties respectively, in vacation, to the Register on ten days' notice to the opposite party, who, if he do no not name commissioners, then the commission to issue *ex parte* on like notice; and in case commissioners are named by both parties, commissions shall issue on like terms *ex parte*, on ten days' notice of filing interrogatories, at the instance of either party; but in case exceptions be filed to the answer, then the Register shall forthwith transmit the papers in the case to the Chancellor, and on return of the same to the Register, if the exceptions be allowed, a rule shall be entered for further answer in six weeks, or attachment; and on the coming in of that answer, the Register shall enter a replication and rejoinder *gratis*, and rule for commissions on both sides in like manner, to be carried into execution as above directed; provided, however, if the complainant should give notice to the Register that he elects to go to hearing on bill and answer, a rule to that effect shall be by him entered, instead of the replications as before provided for.

its equity. This right must be secured by exceptions filed and acted on before the hearing ; for at the hearing no objection can be made founded on the insufficiency of the answer, nor does the omission to answer any allegation of the bill make it evidence. Such being the object of the Rule, it has clearly no application to a motion to dissolve an injunction founded on the answer. On such a motion the preliminary injunction is alone in question. The complainant already has it upon his own sworn bill and for this purpose needs as yet no discovery, though he may need it at the hearing, when the question will be whether the injunction be made perpetual, which depends on the usual course of proof and not on the bill alone. The defendant is now the actor, seeking the removal of the injunction, and his answer, so far as it is used for this purpose, is properly treated as a mere affidavit. With respect to its sufficiency, the proper question is, not whether it makes full discovery of all matters as is necessary for the purposes of a hearing, but whether it shows cause for dissolving the preliminary injunction. If it does not, its insufficiency in this respect like the insufficiency of any affidavit may be objected on the hearing of the motion without exceptions filed. *Wakeman, et al. vs. Gillespy, et al.,* *5 Paige* 112. If the answer does show cause for dissolving the injunction, as it usually does by denying all that is material to the equity of the bill, it is then sufficient for this motion, though it may not make full discovery or answer allegations of the bill not material to the question of dissolving the injunction. If defective in this respect the complainant has his time so to except, as if no motion to dissolve were made, and may compel a full answer before and for the purpose of a hearing.

There is some danger, without care, of being misled on this point by the English books of practice. They lay it down, often broadly, that insufficiency of the answer, *i. e.* any insufficiency, is cause against a motion to dissolve an injunction, and the insufficiency is shown by

exceptions filed. But all this will be found to apply to the common injunction. This is issued to stay proceedings at law until a defendant shall appear and answer to a bill in equity. It does not issue until defendant's default and as a means of compelling him to appear and answer—*i. e.*, to make full answer. If the answer is full, the object of the injunction is effected and it is dissolved as a matter of course, unless the answer itself shows cause for continuing the injunction. In these cases, therefore, the sufficiency of the answer is tested in the ordinary way by exceptions, and any insufficiency whatever is cause for continuing the injunction. In this country common injunctions are not known. 3 *Dan. Ch. Prac.* 1181. *note* (1).

Finally on this point, it should be said that a motion to dissolve a special injunction (such as all under our practice are) is always in order. A defendant under an injunction has been arrested in the exercise of an apparent right, and the interference, if continued, may often work much injury. A motion to dissolve, therefore, should be heard, without regard to ordinary rules of proceeding and with all possible dispatch, consistent with a fair investigation of the subject. It is better to leave such cases to be dealt with according to the exigencies of each, and it is therefore as well that we have no general rule of Court applicable to them.

The hearing of the motion to dissolve was then set for the 19th of April, and, upon the application of the solicitors for both parties, leave was granted to exhibit, at the hearing of the motion, depositions in support of the bill and answer, respectively, the same to be taken upon notice to the adverse party, with opportunity for cross-examination, and to be confined to the matters alleged in the bill and answer, respectively.

Under this order several depositions were taken on both sides, before a Notary Public, and under cross-examination.

On behalf of the complainant the allegations of the bill were proved as to the agreement for exchange in November 1865, and that the books of the hotel were called for and taken by complainant into the room where Ortlip and Swindle were. It was also proved that Swindle talked to complainant, in Ortlip's presence, about staying on if he did not sell the property, and he wanted the ice house filled, which was afterwards done, Swindle being present. They were standing together during the conversation, but Ortlip did not indicate that he had heard Swindle's remark. The advertisements were also proved, and that Coulter was at the hotel March 19th, 1880, exhibiting the assignment, and was heard to tell complainant he should hold him for the rent ; also in February or March one William Carson was heard, at the hotel, to tell complainant that Ortlip had sent word, by him, that Swindle had run away and he expected he would have to take the property back and wanted to know if he could have possession. Complainant sent him word that if he released him from Swindle's lease and would pay him, on the appraisement of two disinterested men, for what furniture he would not want for his own use, he would move out and give up possession. One witness heard the whole conversation and stated that complainant did not send word to Ortlip that he could rent the hotel to whom he pleased. Swindle was present at the Newark sale and alone controlled it. Ortlip was not present and his name not mentioned in the handbill or conditions of sale. Ortlip held himself out as the owner of the Chester County property, offered it for sale and said, if he did not sell before March 1st, he would have it worked on shares, and about that date asked assistance in getting a tenant. He stated that he would make a clear title by the first day of April.

On the part of the defendant it was in evidence that, on the 22nd of February, Ortlip sent word to complainant that Swindle had run away and he would have to rent the hotel from him (Ortlip) and that on the 24th day

of February, Marvel sent word to Ortlip that he (Marvel) gave up the hotel at Newark, that Ortlip might rent it to whom he pleased, for what he cared, and that he was going to leave the hotel. Both these messages were sent by Carson, a stage driver, and the latter was also proved to have been sent by Griffith, who had died, and also by Samuel Carlisle who at the same time leased the property from Ortlip. This witness then went to examine the hotel and conversed with complainant, who told him he had leased from Swindle for five hundred dollars, and paid him two hundred and fifty in money ; that Swindle was to roof the house and sheds, of the leaking condition of which he complained. After this conversation the witness closed the lease, but complainant was not then in the room, nor did the witness inform complainant on that occasion that he had leased or intended to lease. Ortlip went with him over the premises, having first obtained permission from Marvel. A few days afterwards, in Newark, Marvel asked witness if he had leased the house and on being told that he had, said there were a few things he would like him to take. Afterwards, when witness went to measure the rooms, Marvel told him he could measure every room in the house, but he was not going to leave unless he was bought out, and this he repeated later in the day. Carlisle did not attempt to get possession but sent furniture to Newark which had to be stored, and, by losing the hotel, was out of employment, having given up his former place on the faith of the renting from Ortlip. It was also testified that Marvel sent word by Carson to Ortlip and Carlisle to come down and buy the oil cloth and bar fixtures, and take the Swindle lease off his hands, that he was willing to leave it to two men to say what it was worth. This was about two weeks after the first message. Carson distinguished between two messages, and stated that only in the latter, in March, did Marvel refer to being bought off from Swindle's lease as a condition of giving up the hotel.

*T. F. Bayard*, for complainant.

The answer is not sufficient to entitle the defendant to a dissolution of the injunction. Upon this motion it has no effect except as an affidavit. *Adams Equity* (196.) If the answer shows the existence of an equitable question, such question must be preserved intact until the hearing. *Adams Equity*, 196. The present inquiry is as to the existence of an equity, not its effect or result. The denial must be from knowledge of all the circumstances on which the equity rests, not a mere general denial of equity. It must be positive, not on information and belief, nor evasive, nor contradictory, nor will the injunction be dissolved if there is extreme improbability in the defendant's statements. 3 *Dan. Ch. Pr.* 1831. 1 *Ib.* 826, 828, 832. The requirements of answers are more stringent on a motion to dissolve than on exceptions for insufficiency, and even should the defendant deny the equity, and yet not answer fully it is not sufficient on this motion.

Again it is the well settled rule that all the defendants must answer in order to entitle them to a dissolution of the injunction. *Adams Equity*, (196). It is true that there are exceptions to this rule, but they are well defined and do not apply to this case. Here the equity is charged as springing from the acts of both Ortlip and Swindle, and the bill prays for the restraint of both. The denial of complainant's equity by the answer is based on Swindle's acts and declarations, and we are entitled to his answer to enable the Court to determine as to the equity. The facts are not exclusively in the knowledge of this defendant and the gravamen of the charge, the suffering of a third person, caused by his faith in the acts and declarations of both parties, not of one only, is not against this defendant alone, but against both.

*It appears by the Chancellor's notes that the Solicitor for complainant had the opening and reply, although it was a motion on behalf of defendant to dissolve the injunction, but no allusion to or explanation of it otherwise appears.

There are two equities on the face of the bill ; one by the answer fully admitted, the other not fully denied.

*First.* The equitable title vested in Swindle by the written contract of November 1865, under which the complainant as a privy in estate is in as a tenant.

*Second.* The equitable estoppel against Ortlip's interference with the lease of Swindle to complainant to which he gave his assent ; which assent is to be naturally drawn from his acts and declarations, and which it is against conscience for him to deny.

The two conjoined present the case of a lease from Swindle, the legal owner, confirmed by Ortlip, and as to the *first*, complainant does not now claim as Ortlip's tenant. but under the lease of Swindle, which, we insist, is itself valid in equity ; but whatever defect there may be in it alone considered, it is valid by confirmation of Ortlip.

The contract of November 7th, is under seal, with covenant to convey "on or before 25th of March next," with no stipulated time for delivery of possession, and partly performed.    Time was not of the essence of the contract, and there is no proof of its rescission.    Indeed the circumstances indicate the contrary.    *Sugden on Vendors*, 205. Where one fails to perform, the other if he means to rescind must give clear notice to the other of his intention. *Reynolds vs. Wilson*, 6 *Madd* 20 ; *Sugd. on Vend.* 205 ; 1 *Sto. Eq. Jur. p.* 79-80 ; 2 *Ib.* § 882.    From the day of the contract, Swindle had the right to sell devise, lease or otherwise · dispose of, absolutely, not contingently, the premises.    *Sugd. on Vend.* 162-4.

A contract of purchase, in equity, determines a tenancy at will or tenancy from year to year.    If Marvel had purchased of Swindle he would instantly have ceased to be tenant.    If a sale by Ortlip to complainant would have

determined the tenancy, *a fortiori*, a sale by Ortlip's assignee to him. 1 *Sto. Eq. Jur.* § 61. *Addison on Cont.* 158. In equity from the signing of the contract it is the real property of the tenant. *Hunter vs. Slade, 7 Ves. Jr.* 271. And the purchaser under a contract is, in equity, treated as a vendee and owner from the moment of contract. *Add. on Cont.* 158 ; *Ib.* 172-3-5 ; *Sugden on Vend.* 162-4.

Upon a contract of which the general object is sale, title in equity passes, and time is treated as subordinate and not essential unless by stipulation or the necessity of the circumstances, and a court of equity will protect the equitable owner against proceedings, founded on mere legal title. *Addison on Cont.* 172-3-5.

The conduct of the parties was such as to indicate that they treated it as an executed contract from its date, and this Court has no affirmative knowledge that the contract is at an end or that it might not yet decree performance, and mere suspicions cannot affect the rights depending on the right to specific performance.

In the *second place* this is a clear case of equitable estoppel.

The complainant was induced by the public acts and declarations of the defendants to place himself in the relation of tenant to one of them and they are estopped to deny that such acts were done and such powers existed as they held out and he acted upon in good faith. *Gregg vs. Wells,* 10 *Ad. and El.* 90 ; *Coles vs. Bank of England,* 10 *Ad. & El.* 437 ; 2 *Sm. L. Cas.* (459) ; *Peckard vs. Sears,* 6 *Ad. & El.* 469 ; 1 *Cow. and Hills notes to Ph. on Ev.,* 369, 374, 377 ; *Welland Canal vs. Hathaway,* 8 *Wend.* 483; *Dezell vs. Odell,* 3 *Hill* 223 ; *Beaupland vs. McKeen et al.,* 4 *Casey* 124; *Hill vs. Epley,* 7 *Ib.* 331 ; *Brubarker vs. vs. Okeson,* 12 *Ib.* 519 ; *Carr vs. Wahare,* 7 *Whart.* 100 ; *Wendell vs. Van Rensselaer,* 1 *Johns. Ch.* 354; 2 *Wh. & Tud. Lead. Cas. in Eq.* 64.

Apply this doctrine to this case.   The agreement for exchange was private, not of record ; complainant was informed of it only by the parties.   It was expressly proved that he was induced to fill the ice-house which was a sufficient estoppel to warrant suit against Ortlip for filling the ice-house.   It implied a right in Swindle to lease or at least a license to do so.   The act, at Swindle's request under the circumstances, implied the intended relation of tenant to landlord, and Ortlip must be taken to have known at least that Swindle intended to lease and complainant to take it, and there is no allegation in the answer that Ortlip, who knew of the lease, forbade it.   To create an estoppel the acts or declarations need not be made willfully to mislead.  2 *Sm. L. Cas.* 459 ; *Freeman vs. Cooke,* 2 *Exch.* 654 ; *Peckard vs. Sears*, 6 *Ad. & El.* 469.   Nor need the acts or declarations be made to the party affected.

The alleged counter estoppel is new matter, not responsive, set up by way of defence, and therefore not ground for a motion to dissolve.   It is likewise improbable in itself and not fairly proved.   Besides the proof does not shew that Ortlip ever acted upon it.

The objection in the answer that a tenant cannot dispute his landlord's title does not apply.   He may shew that the landlord's title had expired, and that he is in under a new right.   Complainant is in under a new term. *Mountenoy vs. Collins*, 1 *El. & Bl.* 630.   The estoppel is as against the landlord's rights *under* the lease and *during* the term, and, as concerns the tenant's possession, held under the lease.   The present claim is not inconsistent with the landlord's rights under the lease or any effect of the lease.   *Smith on Landlord and Tenant*, 245-6 ; *Sparks vs. Walton*, cited *Whart. Dig. of* 1865, 409.   The tenant may show that the landlord's title ended by legal or equitable transfer to another.   *Sm. L. Cas.* [438.]

With respect to the objection taken to the jurisdiction to interfere, the injunction operates, not on the justice or

his jurisdiction, nor does it assume his jurisdiction ; it acts on the parties in view of equitable circumstances affecting their right to avail themselves of the jurisdiction. *Eden on Inj.* 4.

Nor can the objection that the complainant has an adequate remedy at law be sustained. The meaning of the terms "plain," "adequate," "complete," is well understood. 1 *Sto. Eq. Jur.* §§ 27, 30-33. Equity has peculiar care of rights and interests under contracts respecting real estate. 2 *Sto. Eq. Jur.* $746. The remedy by injunction does not exist only where there is no remedy, but where there is none adequate, none perfect. *Ib.* § 882, 885. It applies to all *legal* proceedings and acts against which equity exists. *Adams' Equity,* 194.

The present remedy is equitable in its nature, founded on the equitable rights of a purchaser, also on the other ground of estoppel. If there is any remedy before the justice, it must be inadequate, merely to prevent Ortlip's present proceeding and it could not adjust or give effect to the rights of the parties.

If the relations to Ortlip are not those of tenants, then the justice's proceedings, do not apply ; particularly if it is not so because of equitable considerations. Title cannot be considered here or in proceedings before the justice.

The provision at the close of *Sec.* 15, *Revised Code,* 1852, *p.* 366, applies to legal remedies only ; if the law meant to exclude equitable interposition it would have so provided.

It is objected that written consent is necessary to an attornment. This does not mean a formal written consent. The contract from Ortlip to Swindle is sufficient : passing an equitable title and with it power to lease, suppose it had been a lease for five years and a sub-lease

instead of a contract to convey. The Statute means consent evidenced by writing.

There is no necessity of a tenant's going out of possession in order to shew expiration of title demised. *Mountnoy vs. Collier*, 1 *El. & Bl.* 630. This is so at law, *a fortiori* in equity.

*Patterson*, for defendant.

With respect to the alleged insufficiency of the answer, the rule is that an answer may not deny facts stated in the bill but may state other facts shewing rights of defendant. *Sto. Eq. Pl.* § § 848, 853. A defendant is not bound to answer positively as to conversation. *Ib.* § 854. An answer by Swindle is not necessary, it is sufficient if there is an answer by the party against whom the gravamen is charged. 3 *Dan. Ch. Pr.* 1822 ; 1 *Sm. Ch. Pr.* 601. Where the complainant requires an answer from the other parties he must take the necessary steps to compel appearance and answer. *Depuyster vs. Graves*, 2 *Johns Ch.* 149.

If the answer contains sufficient defence the injunction will be dissolved. 3 *Dan. Ch. Pr.* 1831. The answer is conclusive against any number of affidavits, 1 *Sm. Ch. Pr.* 601, and is of equal credit with the bill no, matter how many complainants. *Manchester vs. Day*, 6 *Paige*, 295.

This proceeding assumes the jurisdiction of the justice. Under the Landlord and Tenant law the possession necessary to constitute a demise may be either a new possession gained by entry or a continued possession. *Rev. Code* * *pp.* 362 *and* 421 *Sec.* 1. The remedy is intended to be cheap and summary, to be conducted on informal and equitable considerations and not on strict technical grounds. The total absence of any instance of the exercise of equitable jurisdiction to restrain those proceedings, is a strong argu-

---

*The references are to the Revised Code of 1852.

ment against its existence. In the multitude of cases which have occurred under this law there has been no case of interference by the Court of Chancery.

The provisions of the statute are adequate to the relief of the complainant at law. Section 6 (p. 364) provides that if the plaintiff be entitled to possession he shall have judgment. The allegation in the statement is that the defendant "unjustly withholds the same." The jury are to inquire as to the truth of this allegation and the defendant may raise any defence involving the justice or injustice of the holding, equitable or otherwise. It is intended to be an equitable tribunal and the issue cannot be confined to a mere trial of question of lease and notice, for this would not admit of defence in a case where notice was given and waived. The defendant may shew an agreement for a continuance which is (p. 421) provided for as equivalent to a new demise. Another ground on which complainant is relievable under the statute is the provision (p. 366) that a tenant cannot set up an alienation unless he can shew some right in himself; such right he now claims and could have shewn before the justice.

If Ortlip's alleged "acts and declaration," on which complainant relied amount to a waiver of notice or consent in the sense of the statute, then he holds under Ortlip and is relievable under the statute.

But if he does not claim to hold under Ortlip he must claim to hold against him under Swindle without Ortlip's written consent, contrary to the law of attornment. *Revised Code* (1852) *p. 422 Sec. 7.*

The estoppel claimed, if it operates at all, would be in favor of Swindle, of his assignees, or his widow, if he were dead. While they hold the other property no right can be claimed, founded upon any supposed right of Swindle or his assignees, to a specific performance. A specific performance could not now be decreed in favor of Swindle's assignees, when plaintiff has failed to perform, or it

has become impossible to perform.   I *Madd Ch. Pr.* (449); 2 *Sto. Eq. Jur.* § 771 *and notes.*

Substantially the case made for complainant's equity is one of attornment and not of estoppel.   This requires the written consent of the landlord.   An actual conveyance would be equivalent to the "written consent" necessary under the Statutes, under which, upon a grant, no attornment is necessary.   *Rev. Code* (1852) *p.* 442, *Sec.* 6.   Such a written consent is not shewn.   The Statute provides for attornment under decree but this cannot be satisfied by anything the Court is now to do.   The rights of parties here must stand on past transactions.

The principle that the tenant will not be allowed to dispute his landlord's title applies here.   *Greene vs. Munson* 9 *Vt.* 37 ; *Lunsford vs. Alexander,* 4 *Dev. and Bat.* 40 ; *Love vs. Edmonston,* 1 *Iredell* 152 ; *Stearns vs. Godfrey,* 4 *Shep.* 158 ; *Wilson vs. Smith,* 5 *Yerg.* 379 ; *Lee vs. Netherion,* 9 *Yerg.* 315 ; *Drane vs. Gregory,* 3 *B. Mon.* 619 ; *Moore vs. Beasly,* 3 *Ham.* 294 ; *Reed vs. Shepley,* 6 *Vt.* 602; *Moshier vs. Reading,* 3 *Fairf.* 478 ; *Jackson vs. Stiles,* 1 *Cow.* 575 ; *Galloway vs. Ogle,* 2 *Binn.* 468 ; *Jackson vs. Miller,* 6 *Cow.* 751 ; *Dingly vs. Anjovey,* 2 *Ves. Jr.* 304.

No equitable estoppel arises out of the facts of this case.   There are five requisites ; the acts or declarations must have been, (1) designedly made to influence the conduct of another ; (2) they must have in fact influenced it; (3) they must be plainly inconsistent with the present claim ; (4) the present claim must be to the injury of the other party, and (5) the acts or declarations must be with or to the party to be affected.   *Burrill's Law Dict. Tit.* "*Estoppel*"; 4 *Kent's Com.* 261 *note* ; *Dezelle vs. Odell,* 3 *Hill* 215 ; *Peckard vs. Sears,* 6 *Ad. and El.* 469.   The facts of this case do not meet these requirements.   It is vital to the existence of an estoppel that the acts and declarations, which are to work an estoppel, must be brought home to the

party affected ; general acts and declarations such as might affect third persons will not answer. *Pelletrean vs. Jackson,* 11 *Wend.* 117 and cases cited : *Bank of Wil. and Br. vs. Wollaston,* 3 *Harring.* 90 ; *Jackson vs. Rogers,* 1 *Johns. Cas.* 33, 48 ; 1 *Wharton's Dig.* (1843) *p.* 493, *Sec.* 32-34 ; *Crest vs. Jack,* 3 *Watts* 240 ; *Jackson vs. Brinker-hoff,* 3 *Johns. Cas.* 101 ; *Pitting vs. Armitage,* 12 *Ves. Jr.* 78.

The purchaser under a contract of sale is not in equity the owner from the date of the contract, but only accord-ing to its terms. The rule cited from *Addison on Con-tracts p.* 158-9, that equity regards the vendor as a trustee for the purchaser subject to the terms of the contract, is a conventional rule, applied in special cases, to effect justice but never to defeat justice. *Ib.* 174-5. Equity for col-lateral purposes treats as done what ought to be done, not simply what is agreed to be done. Hence, when per-formance is due according to the terms of the contract, equity may in dealing with rights of parties and privies act as if performance was made. The rule is not that equity will treat the contract as performed from the time it is made, but when according to the tenor thereof, it ought to be performed. 1 *Sto. Eq. Jur. Sec.* 64 ; *Har-rington vs. Wheeler,* 4 *Ves. Jr.* 687 ; *Waters vs. Travis,* 9 *Johns.* 450, 466 ; *Benedict vs. Lynch,* 1 *Johns. Ch.* 307. The complainant is himself estopped from invoking the benefit of the estoppel, as claimed, if there were any. Complain-ant's conduct operates both as an estoppel, and also to shew that he had not absolutely relied on the release from Swindle.

THE CHANCELLOR :—

The first ground which, the complainant claims, estab-lishes the validity of the lease and Marvel's right to hold possession under it, is the power of Swindle, as the equi-table owner of the premises from the signing of the contract, to dispose of the possession by lease, to take

effect absolutely from the time at which the contract by its terms was to be performed.

This power to lease, with the effect claimed, it was urged, was incident generally to the equitable ownership taken under a contract of purchase. The complainant's counsel did not, however, rely wholly on this legal position, but claimed further that in this case, it appeared from the declarations, acts and dealings, of these parties with the respective properties, that there had been in fact, by mutual consent, either express or tacit, it mattered not which, an exchange, between Ortlip and Swindle, of an absolute control of the respective properties, to the extent of giving to each the right to dispose of the property taken by him, by sale or lease, to take effect from the twenty-fifth of March absolutely, and not contingently upon the actual execution of the contract; and that such consent annexed to Swindle's equitable ownership the power so to lease the hotel even though it was not a power generally incident to a purchaser's equitable estate.

This ground embraces two distinct points of inquiry, viz :—

*First.* Whether a purchaser, under a contract, before its execution, can, by virtue of his mere equitable estate, without the vendor's consent, lease the property to take effect after the time fixed for performance absolutely, whether the contract shall in fact be performed at the time appointed or not.

This is stating the question truly : For to this extent the complainant's proposition, on this branch of it, must go to avail him, and it is material to bear it in mind. What this controversy concerns is the right of possession after 25th March. Ortlip, the vendor, claims to retain it, the contract of sale being unexecuted ; Marvel claims to hold it, notwithstanding the contract is unexecuted, by

virtue of a lease from Swindle as the vendor. It is, then, Swindle's power to dispose of the possession before the contract is executed, though after the time fixed for performance, that is in question ; and just now the question is whether, as mere purchaser, equity clothes him with that power.

Considered in a practical view, as affecting the security of vendors of real estate, the proposition is a startling one. For, to the vendor, the possession, until the contract shall be executed, is about all that is left by the contract in him, the legal title being really but the shadow of that of which the possession is the substance, and the right to hold it is the vendor's best security for performance by the purchaser. The surrender of this right of possession to any control of the purchaser, to take effect prospectively, it is true, yet absolutely leaves the vendor no other remedy but in all cases to resort to equity for a specific performance. It takes away the protection of the rule that holds these covenants, which are to be concurrently performed, to be conditions precedent to each other, and that he is not bound to convey and deliver possession until the purchaser tenders performance on his part. Or putting the effect of the proposition in another point of view, as soon as the time for performance arrives it substantially executes the contract on the part of the vendor, and against him, without any tender of performance by the purchaser or readiness to perform, or perhaps even ability to perform.

I am aware that sometimes purchasers do take possession before actual conveyance of legal title ; but this is under particular circumstances, induced by confidence on the vendor's part, or some special security to him.

But passing from this practical view of the subject let us examine this question as a legal one to be settled by the course of decisions. A brief examination of it will

show that equity does not confer upon a purchaser any power whatever over the possession of the premises whether by entry, sale or lease, so long as the contract is unexecuted, though after the time fixed for its execution. The vendor's right of possession, or technically speaking his seisin, unless it is otherwise stipulated, attends the legal estate and remains with it in the vendor until passed from him by a conveyance of the legal title. Originally it passed only by livery of seisin, now under the Statute of Uses, and our own Statute of Conveyances (*Revised Code* 266) this seisin passes by deed without livery of seisin. That the vendor should, before the actual execution of the contract of sale, so hold the legal title and with it the possession, is a right under the contract; and this too of equal force, whether expressed as one of its terms or being so by legal construction, as it always is, if there be no stipulation to the contrary.

To subject the right of possession, before the contract is executed, to any control on the part of the purchaser, such as is involved in the proposition considered, would be to change, in a most substantial degree, the terms of the contract, or, which is the same thing, the rights of the parties under it. Equity cannot do this. It does in some respects control the legal rights of the parties, under the contract, but it does so strictly in furtherance of what is deemed the real object of the parties. Thus it will decree a conveyance after the time stipulated in the contract, because under ordinary circumstances, it holds the agreement to convey to be of the substance of the contract and the precise time subordinate and not essential.

But, even as to time, the matter with which equity deals most freely, whenever, either by stipulation or from the circumstances of the case, time becomes of the essence of the contract, a court of equity is held to be as much bound by it as a court of law. In no single instance, so far as can be found, has equity attempted to confer upon,

or recognize in, the purchaser a power in any way to control or assume the possession until the actual execution of the contract by a conveyance. On the contrary, this Court has interposed to protect the vendor's possession against the purchaser, as in *Crockford vs. Alexander*, 15 *Ves.* 138, where a purchaser who had got possession under the vendor's tenant before a conveyance, was enjoined from cutting timber.

Let it be here specially observed that the fact, that the time for executing the contract has passed, does not of itself affect the right of possession, and it is immaterial to whose default the failure to execute is due. For the possession (in the absence of the delivery or consent) passes only by deed with the legal title. Hence, even upon default of the vendor to convey (which is not a feature of this case) the purchaser cannot enter into possession, or by lease put another in, but is put to his bill for a specific performance, to obtain the legal title, and, even then he may have to resort to an ejectment to recover the possession under the legal title. Though equity thus far relieves the purchaser for his delay in recovering possession, it will, in decreeing a specific performance, also decree to the purchaser the profits, from the time fixed for completing the contract, as it will on the other hand decree interest to the vendor, treating that as done which ought to have been done. And this is the whole relief equity attempts to afford to a purchaser against delay in the performance of the contract.

Then it remains only to consider on this point what the text books, and in some cases the courts mean by the broad description they give, cited in argument, of the purchaser's equitable ownership from the time of signing the contract, such as the citation from *Addison on Contracts*, 159, and from Ld. Eldon in *Seton vs. Slade* 7 *Ves.* 274. Describing the difference between the effect of the contract at law and in equity, Addison, quoting Ld. Eldon, says : "at law the estate remains the estate of the vendor

" and the money that of the vendor (until a formal deed " has been executed); in equity the estate,from the signing " of the contract, becomes the .real property of the ven- "dee." These expressions taken literally are inaccurate,— taken in their application to the subject matter before the judges who use them,they mean this, that equity, for certain collateral purposes which do not affect the rights of the vendor and purchaser as between themselves, treats the purchaser's right at law to a future conveyance of the premises as a present estate therein, so as to annex to it some of the incidents of estates at law, making it assignable, devisable, descendible to the purchaser's heirs and subject to his debts.   But equity holds the estate, thus created by it in the purchaser and in all whom it thus enables to take under him, to be subject in all respects to the terms of the contract and to the rights of the vendor, to retain the legal title and the possession undisturbed until the contract shall be executed ; and, we have seen from the case in 15 *Ves.*, it will protect the vendor's possession by injunction.  Addison, on p. 174, thus qualifies the general expressions before used by him.   Speaking again of the contract in equity; he says : " The sale is in effect then " complete ; the lands agreed to be sold becoming the " property of the purchaser, descending to his heirs and " being devisable by his will although the legal estate and " the right of possession may continue in the vendor."

To conclude then this point, Swindle, merely as the equitable owner of the hotel, under the contract, had not, on the 15th of February, the date of the lease to Marvel, nor,at any time since, power to demise the hotel so as to entitle the tenant to the possession after the 25th of March, as against Ortlip the vendor.   Such power could only be exercised under Ortlip's consent.

*Secondly,* This brings us to the second point involved in this ground of equity, which is the complainant's claim that Swindle, though only the equitable owner, had such

a power by *Ortlip's consent*, evidenced by the declarations, acts and dealings of these parties, showing an exchange of control over the respective properties purchased by them.

In considering this point, it is necessary first to deduce from .the bill, answer and evidence together what were the declarations, acts and dealings of the parties on this subject, and then consider their effect.

The consent is claimed to be evidenced by both declarations and acts. What then were they? It is true, the bill alleges that Ortlip "frequently declared," in substance, that it was a sale and bargain, and that each had control and power to lease. The answer denied, sufficiently, all in this allegation that is material and there is no evidence against this denial, except that the witness Hamilton states, that Ortlip told him that Swindle had traded the farm with him for the hotel, which, as language is usually understood, would not imply necessarily an executed sale. The answer also denies having ever declared it was a "sale" in any other sense than as a bargain or contract of sale ; and in considering the declaration in its bearing upon this ground of equity, as evidencing an actual consent to the transfer of control, the meaning of the defendant is material and properly to be considered. The answer further denies positively, that he "at any "time declared that Swindle had a right to rent," &c. The denial of his having at any time so declared quite meets the allegation of the bill, which is that "he fre-"qnently declared" so. The further denial that he "be-"lieved, or gave complainant any adequate or intended "cause to believe," the matter stated goes beyond the line of response. Turning to the evidence on this point, the depositions shew no *declarations* made by Ortlip at any time to any one as to Swindle's control over the hotel or power to lease it ; or as to his own like control over the farm, the whole evidence bearing on this question is of *acts*, not of *declarations*.

I must therefore lay out of consideration this allegation of the bill, treating it as sufficiently controverted for the purposes of this motion, being denied by the answer and unsupported by depositions. With respect to *acts* of the defendants the bill contains two classes of allegations. It alleges generally an exchange of control, which the defendant denies, except that each, relying upon the performance of the contract of sale, endeavored in advance to procure a purchaser. Next the bill charges specific acts of control, and on this subject, as to what was *actually done* by either party, respecting the property purchased by him, the facts are easily ascertainable, the controversy having respect not so much to what *was done* as to the meaning of the parties, and the impression likely to be made by these acts upon the public.

Taken together the bill, answer and depositions establish these facts ; As to *the hotel*, Swindle advertised it for public sale on January 9th. The advertisement in evidence is in the usual form of such advertisements by a person having the legal title. His name is signed and it states that "a good and sufficient title will be given" and that "conditions will be made known at sale." Pursuant to this notice the property was offered, and Swindle, being present, solely controlled the sale ; Ortlip was not present, nor was he named in the advertisement or terms, as read. The property received some bids and was withdrawn because they were not of sufficient amount, and no further effort to sell the hotel appears. On February 15th, Swindle leased to Marvel and received in advance part of the rent. This lease, as well as the advertisement of sale, in its terms, treats the hotel as if it were Swindle's property, and it is in the usual form. Connected with this act may be considered another, that immediately upon the execution of the contract of purchase Swindle made a verbal promise of the hotel to Marvel for the next year and an arrangement for filling the ice-house in anticipation.

As to *the farm*, Ortlip offered it for public sale on January 10th, 1866, by advertisement, signed by his name, sale to be by him, and terms to be made known by him. He exposed it to sale and withdrew it. Ortlip afterwards offered it at private sale, and inquired of Hamilton if he knew any one who wanted to buy, stating his terms, and on Hamilton's naming a person in reply, he went with Hamilton to see that person, and offered to sell. If this person is the James Hatton afterwards referred to in Hamilton's deposition, then we have what passed upon this offer of sale respecting Ortlip's title. He told Hatton "that he would make a clear title by the 1st of April," he "did not intimate that he had "title in him;" nothing more than this, says the deponent, was said about the title.

Hamilton further states that Ortlip told him he should hold it at private sale till March 1st, then, should he not sell, he would have it worked on shares. The same witness also states that, about the 1st of March, Ortlip told some one, on the tavern porch at New London, to tell Joshua Menough to let a person, they had been talking about, have the place. The answer further admits that Ortlip verbally agreed to lease the farm to Robert Tremanas. The time at which this was done is not stated nor indicated by any testimony unless Tremanas was the person referred to in Ortlip's message to Menough. This is a full and exact statement of the several acts and dealings of each party with the respective properties contracted for by them after the date of the contract.

And now the question arises do these *acts*, of offers to sell and of leasing, prove that there was between these parties a mutual consent, or arrangement, that each should deal with the property purchased by him as the absolute owner, and might dispose of it, by sale or lease to take effect after the 25th of March, immediately and in all events and not to be affected by the failure of the execution of the contract of exchange.

This is a question of *intention.* The equity here relied
upon is based on a supposed consent or arrangement,
operating, as between themselves, as an exchange of abso-
lute control of the properties for the purposes stated,
enlarging the usual powers incident to a merely equitable .
ownership, without reference to the question what influ-
ence these acts might have on the minds of parties thus
dealt with.   The acts referred to will be separately con-
sidered in the latter aspect on the question of estoppel.
But, for the present, confining our consideration of them
to the question whether there is proved by them such
mutual consent or arrangement as stated, I am obliged to
conclude after weighing them with much care and atten-
tion that they do not; that they are to be referred, not to
any express or tacit concession of power by each to the
other to deal with the property as an absolute owner, in
advance of the execution of the contract, but rather to
the implicit confidence which each party felt that the
contract would be executed at the time stipulated.   With
the existence of such confidence there is but one circum-
stance seemingly inconsistent.  This is the message, which,
Hamilton states, Ortlip sent, by some one, to Menough to
let a person, they had been talking about, have the place.
The time of this message, as stated by the witness, is
about the 1st of March, after Ortlip, by other testimony,
appears to have known of Swindle's running away, and also
after, as Ortlip himself says in his answer, he had been
informed by the assignees that they could not make him
a title.  There is an improbability, growing out of the cir-
cumstances of the case, that Ortlip at this time would
incur the responsibility of attempting to lease the farm;
He knew that Swindle had absconded, must have felt it
at least doubtful whether the assignees could or would
execute the contract and he is proved to have, before this,
sent word to Marvel of the failure of the contract and had
already leased the hotel to Carlisle.  We must reasonably
conclude that Hamilton is inaccurrate in his recollection

either of the date or purport of the message. It was probably sent before Swindle absconded which was not long before the 1st of March, "about" which Hamilton states as the time of this message.

That a purchaser of property, who is to receive the legal title and possession at the expiration of the current year of the tenancy should make prospective arrangements for the following year's tenancy, and even enter into a written lease for the following year, cannot be unusual. It is a course necessary for the productiveness of the property, which, ordinarily, a purchaser will not hesitate to take, without seeking any consent or sanction of the vendor, or guaranty against the risk that his lease may be ineffectual, through a failure in the execution of the contract. This is a risk which men are not likely at the time to estimate seriously or provide against, but they rather act, confiding that all their arrangements will be carried into effect. Offers to sell, by a purchaser under an unexecuted contract of purchase, are more unusual, as men do not generally buy to sell again at once. And yet, where men are buying for speculative objects, the same confidence, that the contract will be performed at the time stipulated, might well induce the purchaser to offer the property for sale, in advance of the execution of the contract ; and if in doing so he does not undertake to transfer the legal title and possession, until a time at which, by his own contract, he is to receive them, and there is neither allegation nor evidence that either of these parties did so undertake, such a dealing with the property is not inconsistent with the vendor's rights, so that, to warrant it, we must infer the concession to the purchaser of powers beyond what properly attach to his equitable estate.

I have specially weighed in this connection the fact that each advertisement, for public sale, was in the usual form and held out, (though without any express terms,) that the subscriber was the legal owner, and that the

property if sold, would be certainly conveyed ; nor does it appear that, by the conditions of sale, the real relations and powers of the advertiser were indicated.

I do not consider that this mode of advertising proves that these parties gave to each other, or that either meant to assume, any power not consistent with their actual relations to the property. They felt, (as men always do under such circumstances,) implicit confidence that the contract between themselves would be executed ; they weighed lightly, if at all, the contingencies ; they must have been sensible that it would prejudice their offers of sale to announce the incompleteness of their title and that the execution of their own sales if made, would be contingent. Rather than incur this prejudice, a purchaser would naturally take what he would feel to be but the small risk of his not being in a condition to complete a sale if made. These I take to be the real inducements to the mode of advertising adopted and not any arrangement or understanding between these parties. The question of good faith to the public is not here involved. The understanding of the parties, as between themselves, is the matter inquired of.

There are two considerations which weigh strongly against the complainant's construction of these acts as implying an exchange of absolute control over the properties. These are ; 1. Such an exchange of control would take from each, after the 25th of March, the right to hold his own property until actual execution of the contract, a right which we have already had occasion to observe is most important to the security of the vender and which remains to him under the contract. Thus, such an exchange of control, with the effect claimed, would, in the case of Ortlip, deprive him entirely of the hotel property during the term of the lease, while by the failure of the contract of sale, he lost entirely any benefit from the farm. Now parties may thus surrender their rights, yet, if it is to be inferred from acts, those acts should

be of a conclusive character, not reconcilable with any other hypothesis.

2. The defendant's answer denies that Swindle's mode of advertising the hotel, (as he in fact did advertise it,) was with his defendant's consent or authority. The answer respecting this advertisement states among other things "he (Swindle) had no authority to advertise or sell "it as then his his own, and, if he did so, he did so with- "out sanction of this defendant and without right." Now this is a denial of *the very fact* which the complainant infers from the mode of advertisement and sale by Swindle, viz : that there was consent, an arrangement, a mutual exchange of control, &c. This answer is responsive to the bill. The bill charges generally a mutual exchange of absolute control over the properties, and specially the acts and dealings of the parties, including the offers for sale in absolute terms, as done *by consent*, to warrant the general allegations. The defendant denies the general allegation, and also his consent to the offer of the hotel for sale in the mode charged. The defendant's consent is materially involved in the complainant's charge and its denial by the defendant is therefore responsive. Now considering that the acts may, as we have seen, have been naturally induced without the defendant's consent to the exercise of any power, unusual to purchasers, or not warranted by the contract, I do not feel justified in inferring such consent, against the express denial of the answer, not controverted by evidence, and the acts themselves being inconclusive.

I have thus far referred only to the offers at public sale. I need not stop to consider the effort of Ortlip to dispose of the farm at private sale ; for it presents no new or peculiar feature, except one which is in Ortlip's favor. For in the negotiations with Hatton, he said he would make a good title by the 1st of April, which, besides proving that he did not undertake to complete his sale until he expected the title, also carries the impression

that he considered and treated his ability to make a title to be contingent.

I proceed now to the other ground of equity relied upon in the bill. It is this ;—that Ortlip, both by acts, and declarations, induced Marvel to believe that Swindle had the power to lease the hotel so as to give the tenant a right of possession after the 25th of March ; that under this belief, so induced, and relying upon the acts and declarations of Ortlip, Marvel took the lease and paid in advance part of the rent, and that thereupon Ortlip is equitably estopped from impeaching the validity of the lease as against Marvel.

It was upon this ground of equity that the injunction was ordered. I thought then and still think that the bill charges facts sufficient to estop Ortlip from disturbing the possession of Marvel under this lease. It charges that Ortlip had frequently declared "that Swindle had a per- "fect right to rent, sell or do what he pleased with the "said hotel property in Newark and that he Ortlip had "the same rights and powers in relation to the farm," and in a subsequent part of the bill he charges that, being induced by and relying upon these declarations made to himself as well as others, as also by certain public acts and dealings of Ortlip and Swindle with the proprietors, which were, at least, in harmony with these declarations and gave them force, he took the lease and paid his money ; and under the charges of the bill Marvel does not appear to have been then cognizant of the contract or its terms. A clearer case of equitable estoppel than that here charged it is difficult to put. The rule is this ;—where one by his acts, declarations or silence, where it is his duty to speak, has induced another person, in reasonable reliance on such acts or declarations, to enter into a transaction, he shall not, to the prejudice of the person so misled, impeach the transaction. He need not have acted

fraudulently, or willfully have misled the other party. The object of the rule is not to punish for fraud or falsehood, but to adjust equitably a loss between two parties one of whom must bear it, and it is considered that he should bear it who has caused it. This is a most beneficent principle, for it enforces good faith and gives security to that trustfulness which must enter much into business transactions and it applies itself not to any special class or sort of cases, but to all dealings between man and man. But it must be observed that equity applies this principle of estoppel cautiously and only in a case clear upon the circumstances, because in doing so it interferes with what otherwise is to the party an admitted legal remedy. Hence it is required that the matter of estoppel *i. e.*, the facts out of which it arises, be clearly established in evidence ; and then the facts so established must present these two requisites, viz :

1. That the party claiming the estoppel was misled and induced to enter into the transaction upon the faith of the declaration, act or silence of the other, or upon the fact or relation which he seeks to restrain the other party from denying.

2. That his being so misled was not through his own negligence, or want of attention to proper means of information.    For the general maxim, "*Vigilantibus non dormientibus leges adjuvant*," ought specially to apply here, since the interposition of equity in these cases is extraordinary and restrictive of legal rights, and will not be extended to those who have not exercised reasonable diligence to protect themselves.

It is not necessary to refer to cases, to show the rule or its limitations.    The subject is a familiar one.    It is fully treated in 2 *Smith's Leading Cases* 400, *&c.*

Returning now to the case before us.

Although, upon the charges of the bill, a ground of estoppel is shewn, I find it sufficiently denied by the answer and not sustained by affidavits against the answer and must therefore dissolve the injunction.

The estoppel is charged by the bill to arise from both declarations of Ortlip and the acts and dealings of Ortlip and Swindle together. What the acts and dealings of these parties were, are the offers for sale and the leasing of the properties with the attendant circumstances. These taken in connection with declarations made by Ortlip to Marvel, such as are charged, would have weight on the question of estoppel, because they would give force and probability to the declarations ; but considered by themselves without any declarations on the part of Ortlip to Marvel and considering them as impressions on one cognizant, as Marvel was, of the contract, they are not sufficient to estop Ortlip from claiming his right, as the legal owner to the possession of the hotel. And for this clear reason ; equity in applying this doctrine interferes with the legal remedy of the party and with what but for the estoppel, is his clear legal right. It is a serious inter- position. To warrant it the matter of estoppel should be plainly made out, the facts well established and their effect or construction conclusive, at least not doubtful. The present is a clear case for the necessity of this caution. The vendor is to be debarred from the possession of his property before he receives the consideration for it, under the effect of a lease, which, by the omission of Swindle to give notice to quit, may be one of indefinite duration, and he is turned over to his remedy against Swindle, a species of remedy always undesirable and under the circumstances of this case very embarrassing. An estoppel working such effects should be conclusively established.

Now the acts and dealings of Ortlip and Swindle as facts are established and so notorious that Marvel must have been cognizant of them, and to one ignorant of the

contract they would have caused the impression of
ordinary absolute ownership. But to one cognizant of the
contract and its terms, as was Marvel, these acts were
inconclusive, that is, we cannot say that by such acts
alone one, cognizant of the contract, was reasonably in-
duced to believe that Ortlip had conferred on Swindle an
absolute right to dispose of the possession after the 25th
of March. The acts were as naturally referable to the
readiness of the purchaser to anticipate and treat as cer-
tain the execution of the contract. This has already been
fully considered in another connection. One cognizant of
the contract, and about to deal with the purchaser, should
be reasonably held to inquire beyond such acts as these
for the authority of the purchaser to sell or lease the
property absolutely, and the omission to do so would de-
prive him of an equity to this extraordinary relief. I have
assumed as a decisive feature, in considering the effect of
these acts, that Marvel knew of this contract.

It appears by the complainant's affidavits that he was
present at the signing of the contract between Ortlip and
Swindle, and must have been cognizant of its terms.
Armstrong states that this contract was made in a room
at the hotel, that Marvel came from the room for the
hotel books and took them into the room, that Marvel,
Ortlip and Swindle returned together from this room,
where the contract was made, into the bar room, and a
conversation ensued which shewed that the contract had
then been concluded.

I have considered the acts and dealings of Ortlip and
Swindle with the properties and their effect separately,
because, although in the bill they are charged in connec-
tion with declarations of Ortlip, yet, as the case is now
presented, they stand alone. The charge of the bill that
there were declarations of Ortlip inducing Marvel to take
the lease is fully denied by the answer. The denial I have
already quoted. The affidavits prove no such declara-

tions.  There is but one transaction shewn which has
been relied upon as having the force of such a declaration.
It is the conversation between Swindle and Marvel, in
Ortlip's presence, in which Swindle promised Marvel the
tenancy if he should not sell the property, and engaged
Marvel to fill the ice house, which Marvel agreed to do
and did.  Ortlip was present and must be taken, on the
evidence, to have heard it, but said nothing.  Now it is
true, that silence, when there is an obligation to deny
certain facts or relations, upon the faith of which another
party is about to act, and the omission to deny which must
be supposed to have influenced the party to act, is equiva-
lent to an affirmation of these facts or relations, and may
thus work an estoppel.  But it must appear that the party
claiming the benefit of the estoppel did act upon the faith
of the supposed facts or relations, that the party to be
estopped was bound to interpose—that, but for such inter-
position, he would not have become involved in the
transaction.  These are tests so plainly equitable that no
authority for them need be cited.

They will be found implied if not always expressed
in all general statements of the doctrine.  Let us apply
them to the transaction in question.  Did Marvel in this
conversation agree at all to become Swindle's tenent, so
that he could have been held ?  The testimony does not
shew on this occasion more than a proposal by Swindle,
not a bargain.  What Marvel did afterward as to refilling
the ice-house in January does not seem material to the
effect of the conversation on the 7th of November, and
Ortlip's duty then.  Again, supposing Marvel had then ac-
cepted the proposed tenancy, could we say that, being
cognizant of the contract and knowing that Swindle was
but a purchaser under an unexecuted contract, he did not
accept the tenancy as Swindle offered it in mere reliance
upon the certainty of the contract being executed ?  Can
we suppose on the other hand from anything that occurred, that Marvel believed that Swindle could put him

in possession on the 25th of March, whether he got the title from Ortlip or not? And if he did so believe, was it not his own mistake as to the legal rights of parties under the contract? Had not Ortlip, if he heard the proposal, reason to believe that it was made and received upon the assumed certainty that the contract would be executed? There being no reason then to doubt this certainty, whence arose this obligation to suggest a doubt? Had Ortlip any reason from the circumstances to imagine that Marvel supposed Swindle could put him in possession on the 25th of March, without the execution of the contract of purchase? If not, whence this obligation to interpose?

I have found it impossible to answer these and similar questions, so as to involve Ortlip in any breach of duty by his silence on that occasion, and without a breach of duty, silence does not work an estoppel. Indeed I can see nothing in the whole transaction but the natural result of the confidence all must be supposed to have felt that the contract would be duly executed on the 25th of March.

It only remains to add on this subject that it does not appear that Ortlip was present when Marvel took the written lease, or at all cognizant of it or of any other conversations or transactions connected with Marvel's tenancy.

In the argument of this case, the complainant's counsel objected, on two grounds, that the defendant's answer does not entitle him to move for dissolution of the injunction.

*First.* Because the answer, as he insisted, is evasive and does not frankly and fully respond to the allegations of the bill. I do not think, upon a careful examination, that the answer is willfully evasive, taking into consideration the character of the facts. Whether it would be held sufficient, upon exceptions filed under the rule of Court, is not material upon the present motion. To entitle a defendant to move to dissolve a preliminary injunction, his

answer need only deny the facts necessary to the equity of the bill, this much is essential but not more. The sufficiency of the answer as to other matters, and as to all matters about which discovery is sought by the bill, will remain open, and, without respect to this motion or its result, may be tested by exceptions, and further answer if necessary obtained for the purposes of a hearing.

*Second.* The other ground of objection was, that Ortlip could not move to dissolve the injunction until the other defendants, or at least Swindle, had answered. The general rule on this subject and the exceptions were understood alike by the counsel. This case seems to be clearly within the exceptions. Consider these features of it: 1st. The remedy, by injunction, is sought against Ortlip alone. He alone is seeking to dispossess the complainant, and it is against him only that the injunction is prayed. 2d. The equity of the complainant, if any, must spring from the declarations or acts of Ortlip, and it is only so far as the bill charges Ortlip with these that it shows an equity to relief. The complainant's case rests upon the validity of the lease, which, the bill charges, springs, either from Ortlip's transfer of the control of the hotel to Swindle, or from his acts and declarations working an estoppel. Now no acts or declarations but his own could either transfer the possession of the hotel or estop him from claiming his legal rights in it. It is then Ortlip's transfer of the control of the hotel, or his acts and declarations influencing Marvel to take the lease, that constitute the ground of equity or what is the same thing the gravamen of the bill. Swindle's transactions could at best only be circumstantial evidence of an exchange of control. But without Ortlip's connection with them they give the complainant no equity to relief. 3rd. Another material feature of the case is that there is no community of interest between Swindle and Ortlip but it is between Swindle and the complainant. The complainant claims

to hold as Swindle's tenant and is maintaining Swindle's right of possession. If it was necessary for the complainant to make Swindle a party at all, it was not for the purpose of any relief against him under the injunction, but to enable him to protect his own interest in a possession, claimed under his lease. Under these circumstances he is really, and in interest, an adversary party to Ortlip, and his answer would not be read against Ortlip, nor in any way affect his rights nor help the complainant on this motion.

In the argument some questions were necessarily discussed which in the view I have taken of the case have become immaterial.

One of these is, whether Swindle and his assignees still have a right to a specific performance of the contract. Whether they have or not is immaterial, for, unless Ortlip gave to Swindle the power to lease the hotel from the 25th of March absolutely, or unless he has estopped himself from impeaching the lease, his right as the legal owner to the possession of the hotel remains until the contract is in fact specifically executed. Besides the question whether Swindle's assignees are entitled to a specific performance can only be tried by a bill filed by them for that purpose. We could not debar Ortlip from the possession of the property of which he is the legal owner upon the assumption that the assignees have an equitable right which, if they were to seek to establish they might fail and which they may, in fact, not claim, and it is doubtful, under the circumstances, whether they ever will.

If the complainant were the assignee or heir of Swindle so that he could carry into effect Swindle's part of the contract he might file a bill for a specific performance and in this way avail himself of Swindle's rights. But not having Swindle's equitable estate, he is not in a condition to perform Swindle's obligations to Ortlip under

7

the contract and therefore cannot claim, on the part of
Ortlip, a performanee nor the surrender by Ortlip of any
right which depends upon performance.   Unless his lease
is valid, upon the special grounds of equity charged in the
bill his remedy is against Swindle alone.

The defendant's answer, and his counsel in argument,
took several objections to the equity of the bill which did
not go to the merits of the case.   These were, that the
relief sought is in conflict with the rule that a tenant shall
not deny his landlord's title, also that the issuing of an
injunction in such a case was an infringement of a juris-
diction exclusively conferred upon the Justice of the Peace;
that the complainant, if he claimed under Ortlip, had an
adequate remedy in the proceeding before the Justice, and
that he could not claim under Swindle, for, having re-
ceived the possession under Ortlip, a claim to hold under
Swindle would be substantially an attornment to a new
landlord, which the statute requires to be in writing.

Having been obliged to decide the motion against
the complainant, on the merits, these questions were
properly discussed, but it is not necessary for me to exam-
ine them and I will express no opinion on them, further
than to say that they would not prevent me from ordering
an injunction again under like circumstances.