**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

IN THE MATTER OF          )
The Estate of John T. Landon, Jr.   )  C.A. No. 5230-VCZ

## ORDER ENFORCING SETTLEMENT AGREEMENT

WHEREAS:

A.     John T. Landon died on March 30, 2006. On January 25, 2010, the executors of John's estate and children from his first marriage, Keith B. Landon and Ann L. Richter (together, "Petitioners"), initiated this matter seeking instructions regarding the proper disposition of three properties between a life estate for Martha Landon, John's second wife, and the remainder interests for John's children.[1] The matter has proceeded painfully slowly, with three judicial officers urging action based on the lack of case activity.[2]

B.     In 2015, Petitioners moved to enforce a settlement agreement with Martha.[3] I presided over a hearing on that motion on March 20, 2017. Martha was eighty-two years old at the time, had no memory of speaking with her attorney about

---

[1] In this family matter, I use first names in pursuit of clarity. I intend no familiarity or disrespect. For more background and the definitions of defined terms, see *IMO John T. Landon, Jr. Estate*, 2017 WL 2492044 (Del. Ch. June 8, 2017) [hereinafter the "Final Report"]. This report is also available at Docket Item ("D.I.") 128.

[2] D.I. 13; D.I. 25; D.I. 72; D.I. 109; D.I. 151; D.I. 160; D.I. 170.

[3] D.I. 91.

this case and could offer only very general testimony.[4]  She could not recall the settlement negotiations.[5]

C. On June 8, 2017, serving as Magistrate in Chancery, I issued a final report (the "Final Report") concluding Petitioners and Martha, via her son Robert L. Moore Jr. holding her power of attorney, had reached an enforceable settlement agreement.[6]  Martha took exception to the Final Report, and the parties briefed her exceptions;[7] Vice Chancellor Glasscock referred the matter back to mediation before Magistrate Griffin.[8]

D. On July 31, 2018, Magistrate Griffin reported the parties entered into a written settlement agreement (the "2018 Settlement Agreement").[9]  Her letter further provided, "The parties will notify the Court once all conditions of the agreement have been met to request dismissal of the case with prejudice."[10]  The 2018 Settlement Agreement provided in relevant part:  "As of the date this Agreement is finalized, Martha will convey her lifetime interest in the parcel of property with the address of 14660 Coastal Highway, Milton ('Marvel property') as specified in John

---

[4] Final Report at *5.

[5] *Id.* at *6.

[6] *Id.* at *1.

[7] D.I. 131; D.I. 136; D.I. 139; D.I. 140.

[8] D.I. 145.

[9] D.I. 149; D.I. 180, Ex. A [hereinafter "2018 Settlement Agr."].

[10] D.I. 149.

T. Landon, Jr.'s Third Codicil Paragraph 1."[11]  "Although the settlement agreement that came out of mediation appears somewhat simple on its face," both parties have separately and similarly communicated to this Court that it had "many loose ends to finalize."[12]  To date, the parties have not finalized their agreement.

E.     On May 16, 2019, I asked the parties to file a stipulation of dismissal or status update.[13]  The responsive status update stated, "The parties were able to reach a new settlement at that [2018] mediation; however, it was subject to and conditioned upon the consent of certain interested non-parties who have not participated in this litigation, the Avenue United Methodist Church of Milford (Church), and the heirs of Byron Landon."[14]  Those consents were obtained by October 11, 2019.[15]  The parties had one more loose thread to tie up in order to finalize the 2018 Settlement Agreement:  the Estate and co-executors needed to "provide reciprocal releases," and all releases needed to be "as comprehensive as may be devised so as to prevent further litigation on any grounds hereafter regarding the Estate."[16]

---

[11] 2018 Settlement Agr. ¶ 4(d).

[12] D.I. 167; *see also* D.I. 169 at 2 ("[T]he Petitioners view the original agreement as incomplete or loosely written and in need of more detail . . . .").

[13] D.I. 151.

[14] D.I. 152 at Stat. Rep. at 1–2.

[15] D.I. 159 at Other.

[16] 2018 Settlement Agr. ¶ 9.

F.      On February 25, 2020, I again asked whether the case could be closed.[17] Per a joint status update from Martha and Petitioners, counsel was working on the deed contemplated by the 2018 Settlement Agreement and further documentation of their agreement: "[a] draft settlement agreement and release has been drafted and counsel plan to circulate it among the parties for review shortly."[18] The parties negotiated releases over the years that followed, their naturally slow pace reduced further by the inconveniences and sorrows of the COVID-19 pandemic.[19] A December 17, 2021, status update raised "a potential issue as to whether the structure on the Marvel property has been deteriorating in the interim."[20]

G.      On March 21, 2022, Petitioners filed a letter titled "Motion for Order Granting Leave to Inspect Premises," namely the Marvel Property, asserting that Martha allowed it to deteriorate.[21] Martha "d[id] not generally object to an

---

[17] D.I. 160.

[18] D.I. 161.

[19] *See* D.I. 163 at 2 ("Petitioners will present the proposed settlement agreement to the contingent beneficiaries for approval."); *see also* D.I. 165 ("Petitioners are awaiting Respondent's revisions to the draft settlement agreement."); D.I. 167 ("[T]here has been progress made towards finalizing the settlement agreement"); D.I. 169 at 2 ("[T]he Petitioners view the original agreement as incomplete or loosely written and in need of more detail and anticipated that the comprehensive releases referenced therein would address such details."); D.I. 174 at Stat. Rep. 3 ("The parties seem to be at impasse with respect to their differences regarding the proposed documents necessary to consummate their settlement.").

[20] D.I. 169.

[21] D.I. 174 at Stat. Rep. 3–4.

inspection, [but] . . . object[ed] to the intended use of the inspection to establish liability."[22] I held a teleconference urging counsel to put this matter to rest, after which counsel conferred and Martha permitted the inspection.[23] The Marvel Property is in horrible shape.[24]

H.    The parties followed with cross-motions to enforce the 2018 Settlement Agreement, which the parties briefed[25]—with more prompting from this Court[26]—after resolving a safe harbor declaration under the no-contest clause of John's will.[27] The parties disagree as to who bears the responsibility to maintain the Marvel Property, and who bears the responsibility for preparing the deed; both wish to impose on the other these responsibilities. Both have drowned in ink trying to exact further concessions from the other. Neither anchors their argument in the text of the 2018 Settlement Agreement they purportedly seek to enforce.[28]

---

[22] D.I. 175 at 3.

[23] *See* D.I. 177; D.I. 178.

[24] D.I. 179, Ex. G.

[25] D.I. 179, Ex. 1; D.I. 180 at Mot.; D.I. 192 at Resp.; D.I. 193 at Br.

[26] D.I. 187.

[27] D.I. 189.

[28] *See* D.I. 174 at 3 ("Petitioners wish for the settlement documents to reflect Respondent's obligation as life tenant to maintain the property . . . , and to preserve their remedies in the event she has committed waste; whereas Respondent will not agree to settlement documents with such provisions. Petitioners . . . therefore will not execute settlement documents in the form requested by Respondent."); *see also* D.I. 180 at Mot. ¶ 15 ("Martha Landon has had no interest in the Marvel Property since July 10, 2018. Equity regards that as done which in good conscience ought to be done.").

I.     My inquiry begins and ends with the text of the 2018 Settlement Agreement.  Delaware courts encourage negotiated resolutions to contested cases, and for that reason, among many others, settlement agreements are enforceable as a contract.[29]  Delaware courts "will not read a contract to render a provision or term meaningless or illusory" but will interpret contracts in light of the entire contract, giving "each provision and term effect, so as not to render any part of the contract mere surplusage . . . .  When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions."[30]

IT IS HEREBY ORDERED this 28th day of August, 2023:

1.     Petitioners have expressed that the 2018 Settlement Agreement "appears somewhat simple on its face;"[31] insofar as it spans just under three pages, I might agree.  While the 2018 Settlement Agreement is brief, its interpretation is not simple:  there are no definitions for material terms; the tense shifts from present to future imperative to future real conditional imperative; and there is no timeframe or date by which these future events must occur.[32]  What's more, its antepenultimate

---

[29] *Schwartz v. Chase*, 2010 WL 2601608, at *4 (Del. Ch. Jun. 29, 2010); *Asten, Inc. v. Wangner Sys. Corp.*, 1999 WL 803965, at *1 (Del. Ch. Sept. 23, 1999).

[30] *In re: Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56–57 (Del. 2019) (internal citations omitted) (quotation marks omitted).

[31] D.I. 167.

[32] 2018 Settlement Agr. ¶ 4.

paragraph indicates that "This Agreement is contingent upon consents . . . ,"[33] while the ultimate paragraph indicates that "This Agreement shall bind the parties, their heirs, agents and assigns."[34] Certainly, the 2018 Settlement Agreement leaves some business unfinished. Either the 2018 Settlement Agreement is unenforceable because it lacks material terms,[35] or it is an agreement to agree. I conclude that the 2018 Settlement Agreement is an agreement to agree.

2.     "Delaware law has long recognized 'that parties may make an agreement to make a contract . . . if the agreement specifies all the material and essential terms including those to be incorporated in the future contract."[36] The 2018 Settlement Agreement "created an express agreement to negotiate in good faith with respect to the details" that remained open.[37] While "the devil is in the details' with many loose ends to finalize,"[38] "parties to such agreements must negotiate the open

---

[33] *Id.* ¶ 9.

[34] *Id.* ¶ 12.

[35] *Hindes v. Wilmington Poetry Soc.*, 138 A.2d 501, 503 (Del. Ch. 1958) (finding that the absence or indefiniteness of material terms generally rendered an agreement unenforceable).

[36] *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 761 (Del. 2022) (quoting *Vale v. Atl. Coast & Inland Corp.*, 99 A.2d 396, 399 (Del. Ch. 1953)).

[37] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 344 (Del. 2013) (quoting *VS & A Commc'ns Partners, L.P. v. Palmer Broad. Ltd. P'ship*, 1992 WL 339377, at *7 (Del. Ch. Nov. 16, 1992)).

[38] D.I. 167 at 1.

7

terms in good faith . . . ."[39]  This type of agreement to agree is not fully binding on the open terms yet to be negotiated; but the parties are bound to negotiate those open terms in good faith.[40]

3.    The 2018 Settlement Agreement conditions Martha's conveyance of her lifetime interest on finalization of the parties' agreement.  Paragraph 4 provides, "***As of the date this Agreement is finalized***, Martha ***will convey*** her lifetime interest in the parcel of property with the address of 14660 Coastal Highway, Milton ('Marvel property') . . . ."[41]  This language establishes a condition precedent.  Where the parties have created a condition precedent, the occurrence of that condition is necessary to give rise to the other party's duty to perform; if the condition does not occur, the duty never arises.[42]  Whether the agreement establishes a condition is a

---

[39] *Cox Commc'ns*, 273 A.3d at 760–761 (quoting *Vale v. Atl. Coast & Inland Corp.*, 99 A.2d 396, 399 (Del. Ch. 1953)).

[40] *SIGA Techs.*, 67 A.3d at 349.

[41] 2018 Settlement Agr. ¶ 4.

[42] Richard A. Lord, *Williston on Contracts* § 38:7 (4th ed. 1993) ("A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or a contractual duty arises." (footnote omitted)); Restatement (Second) of Contracts § 224 (Am. Law Inst. 1981) ("A condition is an event, not certain to occur, which must occur, unless its nonoccurrence is excused, before performance under a contract becomes due."); *Summit Invs. II, L.P. v. Sechrist Indus., Inc.*, 2002 WL 31260989, at *7 (Del. Ch. Sept. 20, 2002) ("Conditions are events that must occur before a party becomes obligated to perform.").

question of intent to be drawn from the agreement's plain, unambiguous language.[43]

Words and phrases such as "if," "provided that," and "on the condition that" generally indicate the parties have created a condition.[44] The rest of the obligations in the Agreement state that a party "will" perform the stated obligation without any prefatory phrase like "[a]s of the date this Agreement is finalized."[45] For that clause to have meaning, the "Agreement" must be "finalized" for Martha to have the duty to convey her life estate in the Marvel Property.

4.      The 2018 Settlement Agreement does not specify what is required for "this Agreement [to be] finalized." It does not define "Agreement." I believe the

---

[43] *SLMSoft.com*, *Inc. v. Cross Country Bank*, 2003 WL 1769770, at *12 (Del. Super. Apr. 2, 2003) ("Necessarily, whether a condition is one precedent to performance by the other party is divined from the intent of the parties."); Restatement (Second) of Contracts § 226 cmt. a. (Am. Law Inst. 1981).

[44] *SLMSoft.com*, 2003 WL 1769770, at *12; *ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355, at *8 (Del. Ch. Nov. 30, 2017); *Sage Software, Inc. v. CA, Inc.*, 2010 WL 5121961, at *8 (Del. Ch. Dec. 14, 2010*); Kan. City S. v. Grupo TMM, S.A.*, 2003 WL 22659332, at *3 (Del. Ch. Nov. 4, 2003); *see also* Restatement (Second) of Contracts § 226 cmt. a. (Am. Law Inst. 1981) ("No particular form of language is necessary to make an event a condition, although such words as 'on condition that,' 'provided that' and 'if' are often used for this purpose.").

[45] *E.g.*, 2018 Settlement Agreement ¶ 1 (stating Martha "will retain a lifetime interest in the Milford Property," that "Martha will retain use and enjoyment of the property until her death," and "Martha will continue to pay the home equity loan interest only"); *id.* ¶ 3 (stating "Martha will retain lifetime rights to" the billboard property, and "will have the right to convey her lifetime interests"); *id.* ¶ 5 ("Martha shall maintain the properties in which she has a life interest (Milford property and billboard property) during her lifetime in the same condition as they are in as of July 10, 2018."); *id.* ¶ 7 ("Martha waives any claim of spousal allowance from the Estate"); *id.* ¶ 8 ("Martha waives past or future claims for funds towards maintenance of the Milford property whether under Ann's purchase money mortgage or otherwise.").

only reasonable interpretation of "Agreement" is the parties' final agreement, with signed releases and consents; it does not make sense to talk about finalizing the 2018 Settlement Agreement within the 2018 Settlement Agreement.

5.      Nor does the 2018 Settlement Agreement explicitly provide what is necessary to "finalize" the parties' agreement. "Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."[46] The plain meaning of "to finalize" is "to put in final or finished form; to give final approval to."[47] Two paragraphs in the 2018 Settlement Agreement contemplate additional and final approval.  Paragraph 9 contemplates the "devis[ing]" and "provid[ing]" of releases:  "Martha shall provide complete and general releases," and "[t]he Estate and co-executors will provide reciprocal releases.  All releases shall be as comprehensive as may be devised so as to prevent further litigation on any grounds hereafter regarding the Estate."[48] Paragraph 10 makes the agreement contingent upon all parties' approval of the final form of any "waivers/releases/consent of the non-party contingent beneficiaries and remaindermen."[49] I do not see any other steps in the 2018 Settlement Agreement

---

[46] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).

[47] *Finalize*, Merriam-Webster Dictionary, https://www.merriam-webster. com/dictionary/ finalize (last visited August 24, 2023).

[48] 2018 Settlement Agr. ¶ 9.

[49] *Id.* ¶ 10.

that could fairly be construed to be required before the parties' agreement could be characterized as "finalized." Letters from Magistrate Griffin and the parties to the Court echo the parties' intent to finalize releases.[50]

6.      The parties have been unable to agree on the reciprocal releases Paragraph 9 requires. Accordingly, their agreement has not been "finalized." Due to the parties' own inability to satisfy that condition precedent, Martha does not yet owe the duty to "convey her lifetime interest" in the Marvel Property. The parties' agreement has not been finalized; so the condition precedent has not been fulfilled; and so Martha has not been obliged to convey her lifetime interest in the Marvel Property.

---

[50] D.I. 149 ("The parties will notify the Court once all conditions of the agreement have been met . . . ."); *see also* D.I. 169 at 2 ("[T]he Petitioners view the original agreement as incomplete or loosely written and in need of more detail and anticipated that the comprehensive releases referenced therein would address such details."); D.I. 174 at 3 ("The parties seem to be at impasse with respect to their differences regarding the proposed documents necessary to consummate their settlement.").

7.      Nor has Martha conveyed that interest by merely agreeing to do so in the 2018 Settlement Agreement.  Martha contends she has executed a contract for the transfer of real property and has thereby already effectively transferred her legal interest in the Marvel Property to Petitioners under the doctrine of equitable conversion.[51]  Even if Martha correctly understands the general principle of equitable conversion, she misapplies it to the 2018 Settlement Agreement:  Martha agreed to transfer her legal interest only once the releases were finalized, and they have not been finalized.  The equitable conversion doctrine "does not apply to a contract not specifically enforceable due to the existence of a condition precedent."[52]

8.      Both motions are **DENIED**.  The parties have not joined issue on any of their ancillary disputes in a way that presents them for this Court's adjudication.  I must conclude by reinforcing that the 2018 Settlement Agreement is a binding agreement to agree.  In twenty days, any party seeking to maintain this action shall

---

[51] "Equitable conversion is, of course, a well-established principle of equity, arising from consideration of a will or a contract." *Schmeusser v. Schmeusser*, 559 A.2d 1294, 1298 (Del. 1989). The principle underlying equitable conversion "treats that as done, which in good conscience ought to be done." John Norton Pomeroy, *Equity Jurisprudence* § 364 (5th ed. 1941) "Delaware generally follows the majority rule that upon signing a real estate contract, the purchaser has 'become in equity the owner of the land and premises, they are his to all intents and purposes and, as such, any loss caused to them must be borne by him." *Wilmington Sav. Fund Soc. v. Francis*, 2008 WL 4409433, at *2 (Del. Super. Ct. Mar. 31, 2008). "This doctrine is intended to allocate the risk of loss with respect to the property among the parties, between the time the sales contract is entered into and the time legal title passes." *R.M. Williams Co. v. Frabizzio*, 1990 WL 18399, at *2 (Del. Ch. Feb. 22, 1990).

12

show cause as to why it should not be dismissed after five years of failing to finalize the agreement's releases under Court of Chancery 41(e).

/s/ Morgan T. Zurn
Vice Chancellor

---

[52] *R.M. Williams Co. v. Frabizzio*, 1990 WL 18399, at \*2 (Del. Ch. Feb. 22, 1990) (explaining the position of *Briz-ler Corp. v. Weiner*, 171 A.2d 65 (Del. 1961)); *see also Marvel v. Ortlip*, 3 Del. Ch. 9, 29 (Del. Ch. 1866) ("The rule is not that equity will treat the contract as performed from the time it is made, but when according to the tenor thereof, it ought to be performed"); John Norton Pomeroy, LL.D., *Equity Jurisprudence* § 1162 (5th ed. 1941) (If the instrument "created a trust to sell upon the happening of a specified event, which might or might not happen, then the conversion would only take place from the time of the happening of that event but would take place when the event happened exactly as though there had been an absolute direction to sell at that time."); *Id.* § 1163 ("Conversion does not take place at the date of the contract, but at the date when the condition is fulfilled which makes the contract effective. Then the interest shifts on the happening of that fulfillment."); *Eddington v. Turner*, 38 A.2d 738, 739–41 (Del. 1944) (requiring a contract to be "mutually obligatory" in order for the doctrine of equitable conversion to change "the nature of the property," and holding equitable conversion based on an option takes effect from the exercise of the option, not from the date of the agreement by which the option is given); *id.* at 741 ("It is plain then that the doctrine is that conversion does not take place at the date of the contract but at the date when the condition is fulfilled which makes the contract effective. Then the interest shifts on the happening of that fulfillment.").

13